**SHOPCO DISTRIBUTION COMPANY, INC., a North Carolina corporation, Plaintiff,**

v.

**The COMMANDING GENERAL OF MARINE CORPS BASE, CAMP LEJEUNE, NORTH CAROLINA, in his official capacity, Defendant.**

**No. 87–112–CIV–4.**

United States District Court, E.D. North Carolina, New Bern Division.

Sept. 30, 1988.

Jeffrey S. Miller, Jacksonville, N.C., for plaintiff.

Paul M. Newby, Asst. U.S. Atty., Raleigh, N.C., Lt. Col. Lawrence B. Hagel, Judge Advocate, U.S. Marine Corps, for defendant.

## ORDER

HOWARD, District Judge.

This matter is before the court on cross motions for summary judgment filed by plaintiff and defendant. At issue in this case is the constitutionality of the order of the Commanding General of the Marine Corps base at Camp Lejeune, North Carolina which grants the *Globe*, the base Civilian Enterprise Newspaper (hereinafter "CEN"), preferential distribution rights over other non-subscription publications. Plaintiff, publisher of a weekly advertising circular known as the *Shopper*, contends that the General's order restricting door to door delivery on base of non-subscription publications violates the First Amendment's guarantees of freedom of speech and freedom of the press and the equal protection guarantee's of the Fifth Amendment. After careful examination of the record as well as consideration of the able arguments of counsel, this court grants the defendant's motion for summary judgment for the reasons set forth below.

## FACTUAL BACKGROUND

Camp Lejeune is a Marine Corps amphibious training base located in Onslow County, North Carolina. The base covers approximately 68 square miles and serves as the major Marine Corps training facility on the east coast. Several units, including the

Second Marine Division, are permanently stationed at the base. Over 110,000 personnel are stationed or employed on the base.

Although Camp Lejeune is not an "open" base, there is free vehicular entry to five of the nine family housing complexes on the base. With the exception of these five housing complexes, vehicular access to the entire base is controlled by armed sentry. The five "open" housing areas, while not controlled by armed sentries, are easily identifiable as part of Camp Lejeune and are not contiguous to any civilian housing. Warning signs are posted at the entry to each of these areas with the following statement:

NATIONAL DEFENSE INSTALLATION

NO TRESPASSING

ENTER WITH PERMISSION ONLY

All Persons Aboard This
Installation Subject

To Federal Law & Base Regulations

Entry Implies Consent To Search

Of Vehicle and Person While

Entering, Aboard or Leaving This Base

Soliciting or Canvassing Prohibited

for Information Call 451–2197

Having established the physical parameters of the issue, we now turn to the factual basis of the controversy. The instant action has it's genesis in the decision of the Commanding General in July of 1987 giving the *Globe* preferential distribution rights over other non-subscription publications including the plaintiff's advertising circular, the *Shopper*. Specifically, the Commanding General determined that the door to door distribution of non-subscription publications in the base housing areas adversely affected his ability to communicate with his troops and their dependents

through the *Globe*, the base CEN, and posed a potential security risk.

On July 23, 1987, the Commanding General informed the plaintiff by letter that it could no longer deliver the *Shopper* door to door in the base housing areas and that total "stack-out" distribution would be limited to 2,000 copies of each issue on base. Pursuant to the general's order, "stack-out" distribution of the *Shopper* was allowed at 29 various locations on the base including the Base Exchanges and Hostess House but not in the family housing areas. Although the *Shopper* was subsequently allowed to increase it's "stack-out" distribution to 5,000 copies per issue, plaintiff contends that prior to the General's order, it was distributing over 7,000 copies per issue on the base.[1]

By letter dated July 29, 1987, the plaintiff requested that the General reconsider his order and allow the *Shopper* to be delivered door to door in the family housing areas. As a result of the plaintiff's request, the Commanding General initiated a review of the base policy as it related to the distribution of published material. On September 8, 1987, the Commanding General, through the Director of Public Affairs for the base, issued a new order which again restricted door to door delivery of non-subscription publications other than the *Globe*.

By virtue of the September 8th order, any person desiring to distribute a non-governmental, non-subscription publication is required to contact the Base Public Affairs Officer to obtain permission to distribute such material. If approval is granted, the Public Affairs Officer may impose restrictions on the number of copies distributed as well as the location and manner in which they are distributed. Pursuant to the order, non-governmental publications, other than the CEN, are classified as either subscription or non-subscription publications.

As of August 23, 1987, five non-subscription publications had requested, and been

---

1. From 1981 until June 30, 1987, Shopco Publishing was the publisher of the *Globe* pursuant to a CEN contract with the Commanding General of the base. In June of 1987, Shopco lost the

CEN contract in a competitive bidding process. During the time Shopco was the Cen publisher, it delivered the *Shopper* with the *Globe* in the base housing areas.

granted, permission to distribute material at Camp Lejeune. These non-subscription publications include the *Shopper* (Shopco Publishing), *TV Focus* (Shopco Publishing), *The Ad–Visor* (J.B. Enterprises), *The Directory* (T.E.A.M. Inc.) and *This Week Magazine* (Carteret County News–Times). All of the non-subscription publications listed above are allowed to distribute up to 5,000 copies of each issue on the base. Twenty-nine distribution points, including base bus stops and base exchanges, have been made available for such "stack-out" distribution. However, no door to door distribution of these non-subscription publications has been allowed in the base housing areas.

Under the terms of the September 8th regulation, subscription publications may be freely delivered to personnel on base including personnel in the base housing areas. Although door to door distribution is allowed in the base housing areas, solicitation of subscribers on base is prohibited. In addition to a plethora of subscription magazines which are delivered by mail, several subscription newspapers are delivered door to door in the housing areas including the *Wilmington Star*, the *Jacksonville Daily News*, the *News and Observer* (Raleigh, North Carolina) and *USA Today*.

The plaintiff, Shopco Publishing Company, contends that the regulations promulgated by the Commanding General as they relate to the distribution of non-governmental, non-subscription publications violates the guarantees of freedom of speech and freedom of the press contained in the First Amendment as well as the Fifth Amendment's guarantee of "equal protection." The plaintiff's complaint requests that this court enjoin the defendant from enforcing such regulations which restrict the distribution of non-subscription material in the base housing areas.

## DISCUSSION

The primary issue before the court involves the scope of the Commanding General's authority to grant preferential distribution rights to the base CEN. Specifically at issue is whether the granting of such preferential rights is violative of the First and Fifth Amendments. To fully understand the controversy in this case, it is first necessary to examine the statutory authority for the Civilian Enterprise Newspapers.

Pursuant to Department of Defense regulations, the commander of a military base may provide for the dissemination of information to base personnel through the distribution of certain free newspapers. *See* 32 C.F.R. § 202.1(b). These free newspapers may take the form of an Armed Forces Newspaper, as allowed by 32 C.F.R. § 202.4(a) or a Civilian Enterprise Newspaper (CEN), as allowed by 32 C.F.R. § 202.4(b)(5).

As authorized by 32 C.F.R. § 202.7(a), there are three types of Armed Forces Newspapers. The first type of Armed Forces Newspaper is known as an "Authorized Newspaper." The second type of paper is known as an "Overseas Unified Command Newspaper"; an example of such a paper would be the *Stars and Stripes*. The third type of paper is known as a "News Bulletin" or "News Summary." A Cen is distinguished from these newspapers in that all three types of Armed Forces Newspapers are produced and paid for by the various branches of the military.

In contrast, a CEN is published by an independent civilian publisher pursuant to a contract awarded by the base commander based on a competitive bidding process. Before contracting for a CEN, the commander of the installation must establish that "the resources of subordinate commands or activities preclude publication of Armed Forces Newspapers." 32 C.F.R. § 202.4(b)(1).

CENs are designed to allow the commander of a military installation to disseminate vital information to base personnel and their dependents at little or no cost to the taxpayer. As the CEN is distributed free of charge to all base personnel, all revenue from the paper is derived from the sale of advertising. Advertisers are theoretically more likely to advertise in the CEN than other publications as the CEN is granted preferential access to official distribution channels on the base. 32 C.F.R.

§ 202.12(a). It is this preferential access to official distribution channels which theoretically makes the right to publish the CEN attractive to potential publishers. *See M.N.C. of Hinesville, Inc. v. United States Department of Defense,* 791 F.2d 1466, 1469–70 (11th Cir.1986).

## I. FIRST AMENDMENT CHALLENGE

The plaintiff contends that the defendant's actions in regulating the door to door delivery of non-subscription publications in the base housing areas violate the First Amendment's guarantees of freedom of speech and freedom of the press. In analyzing this claim it is necessary to first determine if the government's actions affect activity that is within the scope of the First Amendment. If the activity is within the scope of the protection of the First Amendment, the court must then determine what degree of protection is afforded this activity. In this case it is clear that the General's order restricting distribution rights of certain publications has drawn an explicit classification dealing with the exercise of the fundamental rights of freedom of speech and of the press. As such, this court concludes that the Commanding General's order affects activity within the scope of the First Amendment.

Having determined that the activity in question is within the scope of the First Amendment, the court must next determine the level or degree of protection which is afforded to the activity. This level of protection is defined in terms of the government's justification for the action. To determine the burden that the government must satisfy in justifying it's actions, the court looks at the nature of the forum where the speech is restricted and at the nature of the restriction itself.

In *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 45–47, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983), the Supreme Court set forth an analytical frame for addressing First Amendment challenges dealing with freedom of speech on government property. In *Perry,* the Court stated that "the existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Id.* To this end, the court in *Perry* classified governmental property as traditional public forums, created public forums, and non-public forums. *Id.*

■■] Under the *Perry* scheme of analysis, traditional public forums are places which "by long tradition or by government fiat" have been available for public debate and assembly. Parks and public thoroughfares are commonly held to be traditional public forums. In such a traditional public forum, the government may enforce a content based restriction on speech only if the restriction is necessary to serve a compelling state interest and is narrowly drawn to achieve that goal. *Id.* at 45, 103 S.Ct. at 954. *See also Cornelius v. NAACP Legal Defense and Educ. Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). If the restriction is content-neutral, the state may enforce the restriction as long as it is "narrowly tailored to serve a significant government interest and, leave[s] open ample alternative channels of communication." *Perry,* 460 U.S. at 45, 103 S.Ct. at 955.

■■ The second classification of public property is known as a public forum. Created public forums are property which the government has opened to public debate or assembly. Restriction of speech in created public forums is subject to the same level of scrutiny as applies to traditional public forums. That is strict scrutiny of content based restrictions.

■■ The third and final classification of government property is the non-public forum. These are forums which have not traditionally been open for public debate or assembly. Restrictions which affect non-public forums are subject to a level of scrutiny somewhat lower than strict scrutiny. It is clear that there is certain property to which the "First Amendment does not guarantee access ... simply because it is owned or controlled by the government." *United States Postal Service v. Council of Greenburgh Civic Assn's,* 453 U.S. 114,

129, 101 S.Ct. 2676, 2684, 69 L.Ed.2d 517 (1981). The government may restrict speech in a non-public forum as long as such restrictions are reasonable and are not content based. As with all government property, content-neutral time, place and manner regulations which are reasonable do not violate the guarantees of the First Amendment. *See Perry,* 460 U.S. at 46, 103 S.Ct. at 955.

Under this framework of analysis, military bases have almost universally been held to be non-public forums for First Amendment purposes. *See United States v. Albertini,* 472 U.S. 675, 683, 105 S.Ct. 2897, 2904, 86 L.Ed.2d 536, 545 (1985); *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), but see *Flower v. United States,* 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972) (where a military base has abandoned any right to exclude civilian traffic from an area of the base, a created public forum exists for First Amendment expression). In *Greer,* the Supreme Court held that "the business of a military installation ... [is] to train soldiers, not to provide a public forum." *Id.* 424 U.S. at 838, 96 S.Ct. at 1217. "The notion that federal military reservations, like municipal streets and parks, have traditionally served as a place for free public assembly and communication of thoughts by private citizens is thus historically false." *Id.*

In the case presently before the court, the plaintiff contends that the base has been opened to the public by the actions of the commander which allow certain non-governmental publications to be distributed door to door in the housing areas. After careful consideration of this argument, the court finds that the government has not ceded any control over the base housing areas by virtue of it's actions. As noted above, every entrance to the base is either controlled by armed sentry or is conspicuously marked with warnings setting forth the military's absolute control over the area. Although some areas of the base are open to civilian service industries, such as pizza delivery services and dry cleaners, everyone who enters the base is subject to the Commanding General's control and reg-

ulation as clearly stated by the warning signs at every entrance to the base. In short, the court finds no evidence that the base housing areas have been opened to the public for the purposes of debate or assembly.

Having determined that the base is a non-public forum, the court next considers the level of protection afforded the *Shopper* as relates to it's right to door to door distribution in the base housing areas. After careful analysis of the arguments put forth by both parties, this court finds the decision in *M.N.C. of Hinesville, Inc.,* 791 F.2d 1466 (11th Cir.1986) to be particularly helpful in the resolution of this matter. In *M.N.C.,* the Eleventh Circuit held that the government's actions in granting a CEN preferential distribution rights were valid under the First and Fifth Amendments. The Eleventh Circuit continued by stating that preferential distribution rights were justified as:

> The CEN is a special newspaper ... The military has an interest in distributing to it's personnel material that is not otherwise readily available. This information, whether or not crucial to national security, undoubtedly enhances the quality of life on a military base. By informing its personnel of upcoming events the Army furthers a sense of community on the base ... Establishment of a CEN allows the government to further its interest in disseminating this information while imposing no costs on the taxpayers. *M.N.C.,* 791 F.2d at 1476.

The court further stated that "[t]he CEN is the chosen mechanism by which the Army disseminates information to its troops.... One sure way the Army can distinguish for its troops the importance between the CEN and other news media is to distribute it through exclusive channels." *Id.*

The plaintiff in the case presently before the court, argues that *M.N.C.* can be distinguished on the grounds that here the Commanding General's order affects only non-subscription publications and therefore is discriminatory, while the order in issue in *M.N.C.* affected all publications. Although this argument is facially appealing, this

court believes that the reasoning set forth in *M.N.C.* applies with full force in this case. As set forth above, the Eleventh Circuit saw the importance of the CEN in allowing the base commander to effectively communicate with his troops and their dependents and to foster a sense of community on the base. These goals of communication and community spirit are certainly reasonable and serve to justify the regulation of the distribution of publications which interfere with these goals.

■] This court finds particularly persuasive the Eleventh Circuit's discussion of the economic justification for allowing preferential distribution of the CEN. As stated by the court in *M.N.C.*:

> Another factor in upholding the reasonableness of granting preferential access to a CEN is the effect this monopoly may have in increasing the number of publishers willing to publish a CEN.... The preferential access rights have economic value either in terms of increasing the number of advertisers willing to place ads in a CEN or increasing the rate a publisher can charge the advertisers. *M.N.C.*, 791 F.2d at 1476.

In this case, it is clear that the space available to the Commander for dissemination of information in the CEN is directly related to the amount of advertising space sold by the CEN in each issue. Simply stated, the more advertising that is sold, the more space the CEN allots for the Commanders communications. Assuming that facilitating communication of information to base personnel is a valid goal of the CEN, then a regulation which restricts the distribution of certain publications which reduce the effectiveness of the CEN is justified and valid under the First Amendment.

Lastly, the court is compelled to recognize the government's interest in providing for security on it's military installations. Although there have been few problems or incidents in the past, these are troubled times in which the planting of bombs or taking of hostages are common. Unfortunately, the military and it's personnel often bear the brunt of such senseless and tragic acts. As such, the Commander of the base has wide latitude to implement regulations which are designed to protect those persons for whom he is responsible. In this case a regulation which restricts the door to door delivery of unrequested materials is a reasonable measure designed to promote security and tranquility in the base housing area.[2]

## II. FIFTH AMENDMENT CHALLENGE

Having determined that the granting of preferential distribution rights to the CEN does not violate the plaintiff's First Amendment rights, the court next addresses the plaintiff's Fifth Amendment challenge. Pursuant to the Fifth Amendment, no person shall be "deprived of life, liberty, or property, without due process of law...." Plaintiff asserts that the General's order deprives him of his liberty interest in free speech as guaranteed by the First Amendment.

■ In analyzing claims under the Due Process Clause of the Fifth Amendment, a two tiered analysis is appropriate. Under the first tier of this framework of analysis, the plaintiff must show that it has been denied life, liberty or property to such a degree as to warrant due process. If such a showing is made, the court must determine what process was due. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

■ In this case, plaintiff asserts that the defendants actions have infringed on his First Amendment rights, therefore denying him a fundamental liberty under the Fifth Amendment. As the court has determined that the General's actions were rea-

---

**2.** Plaintiff argues that there is no basis for distinguishing between the home delivery of requested services such as pizzas and subscription newspapers and the door to door delivery of the *Shopper.* In response to this argument, the court simply notes that although certain civilian services are permitted access to the housing areas, such access is on the basis of a direct request by a resident of the housing area and is not an unsolicited canvass of the housing area. Such unsolicited access potentially operates as a greater threat to security and tranquility in the housing areas than does the delivery of requested civilian services.

sonable and did not violate the First Amendment, there can be no claim of loss of liberty interest by the plaintiff. Further, the plaintiff has failed to establish any property interest subject to protection under the Fifth Amendment. For these reasons, the plaintiff's claims under the Fifth Amendment must fail.

## SUMMARY

The court is faced today with the issue of whether the Commanding General of the Marine base at Camp Lejeune may grant a Civilian Enterprise Newspaper preferential distribution rights over other publications. After careful consideration of the briefs and oral arguments presented by both parties, this court is left with the firm impression that the regulations imposed by the Commanding General are valid under the First and Fifth Amendments.

The court reaches this result based on the time honored principle that military installations are generally non-public forums which are not open to public assembly or debate. Additionally, this court recognizes the heritage of the Commanders authority over activities which affect the operation and morale of his or her base. "A necessary concomitant of the basic function of a military installation has been 'the historically unquestioned power of [its] commanding officer summarily to exclude civilians from the area of his command.'" *Greer v. Spock*, 424 U.S. at 838, 96 S.Ct. at 1217, quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 893, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

Perhaps most significant is the Eleventh Circuit's decision in *M.N.C.*, which held that the granting of preferential distribution rights to a CEN was permissible under both the First and Fifth Amendments. The court in *M.N.C.* recognized the governments legitimate interest in disseminating official information to its troops and their dependents. The court further recognized the concomitant economic benefit realized by the taxpayers in having a viable and successful CEN. By it's holding, the court in *M.N.C.* recognized that these goals were rational and served to justify the granting of preferential distribution rights to the CEN.

In the case presently before the court, it is clear that the base housing areas are not public forums and that the regulation is content-neutral. Therefore the challenged regulation of free speech should be analyzed under the rational basis test. As set forth above, this court holds that the commander's need to disseminate official information in an effective and cost efficient manner serves to rationally justify the granting of preferred distribution rights to the CEN over other competing publications. The Commanding General's order does not totally ban the distribution of non-subscription publications but rather only limits the location of their distribution. Publications such as the *Shopper* still have the right to "stack-out" distribution at various locations on base including the base exchange. Additionally, the plaintiff is not prohibited from soliciting subscribers by mail in an effort to distribute his publications in the base housing area on a subscription basis.

In this case we address the scope of a military commander's authority to regulate First Amendment rights on his base. As stated in *Greer*, a military installation is "the enclave of a system that stands apart from and outside of many of the rules that govern ordinary civilian life in our country." *Greer*, 424 U.S. at 843, 96 S.Ct. at 1220. This is not to say that the First Amendment and other protections of the Constitution do not apply in the sphere of a military installation but rather that it is necessary to consider the special nature and function of a military installation when analyzing claims under the First Amendment.

Here, the Commanding General's order is rationally related to the legitimate goals of effectively and efficiently disseminating official information to his troops and their families and of fostering a sense of community spirit on the base and of providing security and tranquility. In light of these legitimate goals, the General's order which grants preferential distribution rights to the base CEN is held not to be in violation

of the rights guaranteed by the First or Fifth Amendments. For these reasons, the motion for summary judgment filed on behalf of the defendant is granted and the corresponding motion filed by the plaintiff is denied. In accordance therewith, the court grants summary judgment in favor of the defendant Commander General.