885 F.2d 167
 SHOPCO DISTRIBUTION COMPANY, INC., a North Carolina
Corporation Plaintiff-Appellant,
v.
The COMMANDING GENERAL OF MARINE CORPS BASE, CAMP LEJEUNE,
NORTH CAROLINA, in his official capacity,
Defendant-Appellee.
 No. 88-2974.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 10, 1989.
Decided Sept. 13, 1989.
Rehearing and Rehearing In Banc Denied Nov. 8, 1989.
 
 1
 Jeffrey Stephen Miller, Jacksonville, N.C., for plaintiff-appellant.
 
 
 2
 Margaret Person Currin, U.S. Atty., Paul M. Newby, Asst. U.S. Atty., Lieutenant Colonel Lawrence B. Hagel, Judge Advocate, U.S. Marine Corps (Commander Malvern F. King, JAGC, U.S. Navy, on brief), General Litigation Div., Office of the Judge Advocate General of the Navy, for defendant-appellee.
 
 
 3
 Before HALL, Circuit Judge, HAYNSWORTH, Senior Circuit Judge, and ELLIS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 
 ELLIS, District Judge:
 
 4
 This case raises important questions concerning the scope of first amendment protection on military bases. The Globe is the Civilian Enterprise Newspaper[1] ("CEN") on the Camp Lejeune Marine Corps Base in Onslow County, North Carolina. Camp Lejeune's Commanding General granted The Globe preferential distribution rights over other non-subscription publications. Appellant, publisher of The Shopper, an advertising circular, challenges the constitutionality of this order. In a clearly reasoned opinion, the district court granted the Commander's motion for summary judgment. Shopco Distribution Co. v. Commanding General of Marine Corps Base, Camp Lejeune, North Carolina, 696 F.Supp. 1063 (E.D.N.C.1988). We also find no constitutional infirmity in the Commanding General's order and thus affirm the district court's decision.
 
 
 5
 * Camp Lejeune is the major Marine Corps training facility on the East Coast. Several units, including the Second Marine Division, and over 110,000 personnel are either stationed or employed there. Although Camp Lejeune is not open to the general public, five of the nine family housing complexes on the base have free vehicular entry. These five "open" housing areas are not located near any civilian residential areas and are easily identified as part of Camp Lejeune. Access to them is restricted to residents, invited guests and those on official business. Signs are posted informing visitors of these restrictions. Base regulations also prohibit door-to-door solicitation at all base housing areas. Military Police routinely enforce all restrictions. Access to the remainder of the base is controlled by armed sentries. A number of off-base pizza and laundry delivery services regularly furnish pick-up and delivery services to base housing areas upon receiving telephone orders.
 
 
 6
 In the performance of his duties, the Commanding General must communicate with both military and civilian personnel on base. 32 C.F.R. Sec. 297.5(d)(1)(i). To facilitate this communication, the Secretary of Defense has promulgated regulations permitting commanding officers, such as Camp Lejeune's Commanding General, to distribute free newspapers which include information not normally found in commercial publications. 32 C.F.R. Sec. 297 et seq.[2] These newspapers are the primary means by which commanding officers communicate important information to personnel. 32 C.F.R. Sec. 297.5(d)(1)(i). They fall into two categories. Armed Forces Newspapers are published directly by the military, and the costs of publication are borne by the government. 32 C.F.R. Sec. 297.3(b)(2). On the other hand, CENs, like The Globe, are published and paid for by civilian publishers pursuant to contracts with individual bases. 32 C.F.R. Sec. 297, Encl. 2, p A. The civilian publisher may cover its costs and earn a profit through the sale of advertising. Id. Thus, the CEN allows base commanders to disseminate important information at no cost to the government.
 
 
 7
 As required by federal regulation, The Globe 's editorial content is prepared solely by the Camp Lejeune public affairs staff. 32 C.F.R. Sec. 292.3(b)(1). Its content is subject to significant regulation. The Globe, for example, may not use articles derived from commercial news or opinion sources. 32 C.F.R. Sec. 297.5(b)(5). News coverage must be factual, objective and in good taste. 32 C.F.R. Sec. 297.5(b)(1). Articles must clearly differentiate between statements of fact and expressions of opinion. The latter must be attributed to a specific source. 32 C.F.R. Sec. 297.5(b)(2). All articles must be balanced and accurate. Id. No article may contain news or editorials relating to political campaigns. 32 C.F.R. Sec. 297.5(b)(8). Nor is political polling or the publication of political polls allowed. 32 C.F.R. Sec. 297.5(b)(10). If paid political advertisements are published, The Globe must give all legitimate opposing candidates equal opportunity to advertise. 32 C.F.R. Sec. 297.5(b)(8).
 
 
 8
 Since advertising is expected to cover the costs of publishing a CEN, there is, understandably, a relationship between the amount of advertising the CEN attracts and the space available in the CEN for the dissemination of information by the base commander. In general, the more advertisements received, the more pages are published, hence more space is available for base material. More specifically, the civilian publisher of The Globe is obligated to publish a base article only if it has sold enough advertising to cover production costs for the page on which the article is included. Although the commercial publisher supervises the advertising portions of CENs such as The Globe, the Commanding General may review the contents of the advertisements and prohibit distribution if the advertising poses a threat to the "loyalty, discipline, or morale" of personnel. 32 C.F.R. Sec. 297, Encl. 2, p H. Notwithstanding this degree of control, CENS are considered non-governmental publications.
 
 
 9
 The Globe was not always a CEN. Historically, it was an Armed Forces Newspaper, published at government expense. Not until 1981, did it become a CEN. Then and for the next six years, the appellant published The Globe. But in June 1987, following a competitive bidding process, appellant lost The Globe publishing contract to Jacksonville Publishing Company. Appellant now publishes only two publications, TV Focus and The Shopper. Only the latter is relevant here.
 
 
 10
 The Shopper is an advertising circular distributed throughout Onslow County. Its contents consist primarily of commercial advertisements and a variety of public service announcements. In civilian residential areas, The Shopper is typically distributed door-to-door in plastic bags hung on the doorknobs of individual residences. The Shopper was similarly distributed in Camp Lejeune's housing areas from its inception in 1975. This door-to-door delivery of The Shopper was effected pursuant to permission from Camp Lejeune authorities. Indeed, throughout the period appellant published both The Globe and The Shopper, the papers were distributed door-to-door together. No complaints were ever received concerning either The Shopper 's contents or its mode of delivery.
 
 
 11
 Although appellant lost the contract to publish The Globe in June 1987, it continued its practice of distributing The Shopper door-to-door at Camp Lejeune. During July 1987, the Commanding General was informed that if appellant continued to distribute The Shopper door-to-door, The Globe 's ability to attract advertising, and hence its ability to publish Camp material, would be adversely affected. Accordingly, the Commanding General directed the Camp Lejeune public affairs officer to inform appellant that it could no longer distribute The Shopper door-to-door. Instead, The Shopper 's distribution was restricted to 2000 copies of each issue in stacks located at various shopping and gathering places throughout Camp Lejeune. Appellant requested reconsideration of the limits placed upon The Shopper 's distribution. In response, the Commanding General reviewed the Base Order regarding the circulation of non-governmental printed material at Camp Lejeune. Following this review, the Commanding General published a new Base Order regulating distribution of printed materials. Under the new Order, publications approved for distribution within Camp Lejeune fall into two classes: subscription and non-subscription. Subscription publications may be delivered to the doors of subscribers residing at Camp Lejeune housing areas. Subscription publications may not, however, send persons door-to-door to solicit subscribers. Non-subscription publications, like The Shopper, may not be delivered door-to-door on Base; their distribution is limited to 5,000 copies from racks placed by the distributor at 29 common locations at Camp Lejeune. The new Base Order is in accordance with federal regulations which provide that, except for CENs and Armed Forces Newspapers, non-subscription publications "shall be made available only [by being placed] in specific general use areas specified by the commander...." 32 C.F.R. Sec. 297, Encl. 5, p D. Among the non-subscription publications distributed at Camp Lejeune, only The Shopper and The Extra had previously been distributed door-to-door. The remainder of the non-subscription publications had traditionally been distributed in general use areas. Appellant's authorized distribution of The Shopper was increased from 2,000 to 5,000 copies in accordance with the new Base Order.
 
 
 12
 Appellant believes distribution in general use areas does not allow it to communicate effectively with the residents of Camp Lejeune, a major segment of the consuming public in Onslow County. Appellant, therefore, now mails The Shopper to residents of Camp Lejeune at a cost of $400.00 per week. Because the mailing costs far exceed the costs of hand delivery, appellant contends that the continued economic viability of The Shopper is threatened. For this reason, appellant filed suit contending that the Commanding General's actions violate appellant's right to freedom of commercial speech under the First Amendment and its equal protection and due process rights guaranteed by the Fifth Amendment. The district court granted appellee's motion for summary judgment on all claims and this appeal followed.[3]II
 
 
 13
 Appellant's first amendment claim must pass a two-part test. First, appellant must establish that the speech in issue is commercial speech entitled to First Amendment protection. Central Hudson Gas & Elec. v. Public Service Comm'n of New York, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980). For commercial speech to receive first amendment protection, it must concern lawful activity and must not be misleading. Id.; see also Friedman v. Rogers, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979); Pittsburgh Press Co. v. Human Relations Comm'n, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). Here, as appellee concedes, the speech contained in The Shopper meets this part of the test and thus merits the constitutional protection afforded commercial speech. The dispute on appeal centers on the second part of the test which requires the Court to determine whether the governmental regulation of speech was justified. Bd. of Trustees of State Univ. of New York v. Fox, --- U.S. ----, 109 S.Ct. 3028, 3032, 106 L.Ed.2d 388 (1989); Posadas de Puerto Rico Ass'n v. Tourism Co. of Puerto Rico, 478 U.S. 328, 340, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986); Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 638, 105 S.Ct. 2265, 2275, 85 L.Ed.2d 652 (1985). Analysis of this question requires weighing two factors: (1) the type of forum where the speech takes place and (2) the nature of the governmental restriction. See Nat'l Socialist White People's Party v. Ringers, 473 F.2d 1010, 1014 (4th Cir.1973) (en banc); Henrico Prof. Firefighters Ass'n, Local 1568 v. Bd. of Supervisors of Henrico County, 649 F.2d 237, 245-46 & n. 13 (4th Cir.1981); M.N.C. of Hinesville v. U.S. Dept. of Defense, 791 F.2d 1466 (11th Cir.1986).
 
 
 14
 Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), establishes the framework for reviewing the reasonableness of speech regulation on government property. Under Perry, government property falls into three categories: (i) traditional public forums, (ii) created public forums, and (iii) non-public forums. Id. at 45-46, 103 S.Ct. at 954-955. Traditional public forums, such as public parks and streets, are subject to sweeping constitutional protections. In these fora, governmental restrictions of speech based on content survive only if narrowly tailored to serve a compelling state interest. Carey v. Brown, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980). Content-neutral restrictions of time, place and manner must be narrowly tailored to serve a significant governmental interest and must leave open ample alternative avenues of communication. United States Postal Service v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 132, 101 S.Ct. 2676, 2686, 69 L.Ed.2d 517 (1981); Consolidated Edison Co. v. Public Service Comm'n, 447 U.S. 530, 535-36, 100 S.Ct. 2326, 2332-33, 65 L.Ed.2d 319 (1980). Created public forums are forums, such as university meeting facilities, school board meetings and municipal theatres,[4] which the government "has opened for use by the public as a place for expressive activity." Perry, 460 U.S. at 45, 103 S.Ct. at 954. The government need not open such forums to the public. But once opened, speech in these forums is subject to the same protections as speech in traditional public forums. Perry, 460 U.S. at 45-46, 103 S.Ct. at 955. The third category of governmental property is the non-public forum. These are forums that are not traditionally public forums and have not been opened by the government for public use. In non-public forums, such as correctional facilities, Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), and teacher's mailboxes at public schools, Perry, 460 U.S. at 46, 103 S.Ct. at 955, the State may, in addition to imposing time, place and manner restrictions, "reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's views." Perry, 460 U.S. at 46, 103 S.Ct. at 955 (citing United States Postal Service v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 131 n. 7, 101 S.Ct. 2676, 2685-2686 n. 7, 69 L.Ed.2d 517 (1981)).[5]
 
 III
 
 15
 Almost without exception, courts have concluded that military bases fall into the non-public forum category.[6] In the words of the Supreme Court, because "the business of a military installation ... [is] to train soldiers, not to provide a public forum," Greer v. Spock, 424 U.S. 828, 838, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976), "[a] military base ... is ordinarily not a public forum for First Amendment purposes even if it is open to the public." United States v. Albertini, 472 U.S. 675, 684, 105 S.Ct. 2897, 2904, 86 L.Ed.2d 536 (1985) (citing Greer ). Only once have portions of a military base been found to be a public forum. In Flowers v. United States, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972), the Supreme Court characterized an avenue running through a military base in San Antonio as a public forum because it was used as a public thoroughfare by the people of San Antonio. In the Court's view, that thoroughfare was "no different from all the other public thoroughfares in that city...." Greer, 424 U.S. at 835, 96 S.Ct. at 1216, and hence it "was appropriately considered a public street." Albertini, 472 U.S. at 685, 105 S.Ct. at 2904. Significantly, the Supreme Court has explicitly limited Flowers to its "unusual facts." Id. The authorities all point ineluctably to the conclusion that Camp Lejeune is a non-public forum where, simply put, "there is 'no generalized constitutional right to make political speeches or distribute leaflets' on military bases, even if they are generally open to the public." Id. (citing Greer, 424 U.S. at 830, 838 & n. 10, 96 S.Ct. at 1213-14, 1217 & n. 10); see also Brown v. Glines, 444 U.S. 348, 354-55, 100 S.Ct. 594, 599-600, 62 L.Ed.2d 540 (1980).
 
 
 16
 Seeking to avoid this result, appellant contends that Camp Lejeune's base housing areas have become public forums (1) because pizza and laundry delivery services may deliver to Camp Lejeune customers; (2) because certain areas of the base include civilian-run, commercial enterprises; and (3) because the Commanding General has in the past allowed a non-governmental publication, the Shopper, to be distributed door-to-door. These arguments must be rejected. Camp Lejeune's residential areas are sharply and easily distinguished from civilian residential areas. Access to four of the nine camp housing areas is controlled by armed sentries. Access to the remaining five areas is restricted to residents, invited guests, and those on official business. These restrictions are posted and enforced by military police. By imposing and enforcing these access restrictions, the Commanding General has taken the necessary steps to preserve the status of the Camp's residential areas as integral portions of Camp Lejeune. They are, in this important respect, different from all other residential areas in Onslow County. Greer, 424 U.S. at 838, 96 S.Ct. at 1217. Pizza and laundry deliveries do not convert the base housing areas to a public forum. Pizza and laundry are not delivered door-to-door without solicitation. Rather, these services are solicited by the Camp's residents.[7] Nor does the civilian operation of businesses at shopping centers located on Camp Lejeune convert the housing areas into public forums. This commercial activity is limited to specific areas of Camp Lejeune established for commercial activity. It does not take place in the Camp's residential areas. Significantly, in common with these civilian store owners, appellant is presently allowed to distribute its publications at base shopping centers.
 
 
 17
 Finally, Perry forecloses appellant's contention that the previous door-to-door distribution of The Shopper to the Camp's residential areas converts these areas to public forums. In Perry, the Supreme Court rejected a claim by a school teachers' union that it was entitled to access to teachers' mailboxes in the schools. The record disclosed that access had been granted to a number of community service organizations and to a rival union that had defeated the claimant union in a representation election. Prior to losing the election, the appellant union in Perry had also enjoyed access to the mailboxes. Following its defeat, access was denied. In rejecting the appellant union's claim, the Court noted that the government does not create a public forum by inaction, by unintentionally opening a non-public forum to public discourse, or by permitting limited discourse, Perry, 460 U.S. at 46, 103 S.Ct. at 955. The Supreme Court found that the school district had not, through its access policies, transformed a non-public forum into a public one. Id. at 48, 103 S.Ct. at 956. Rather, the school district was enforcing a regulation in a non-public forum that discriminated against the union on the basis of its status. Id. at 49, 103 S.Ct. at 957. Moreover, the Court noted, discrimination based on status, even if unreasonable, did not change the mailboxes from non-public to public forums. Id. Here, as in Perry, the Commanding General chose to allow The Globe door-to-door delivery privileges based on its status as a CEN and blocked such distribution on the part of The Shopper because appellant no longer published the Camp's CEN. The Commanding General's reasons for doing so could have been unreasonable and, therefore, violative of the First Amendment. Perry, 460 U.S. at 46, 103 S.Ct. at 955. But his actions did not change the housing areas from non-public to public forums.
 
 
 18
 Even assuming arguendo that the Commanding General did, by previously granting permission to The Shopper to distribute door-to-door, change Camp Lejeune housing areas from non-public to public forums, he "is not required to indefinitely retain the open character of the facilit[ies]." Perry, 460 U.S. at 46, 103 S.Ct. at 955. His revocation of appellant's right to distribute the Shopper door-to-door would clearly demonstrate his intent to make base housing areas generally off limits to door-to-door delivery. This intent is also demonstrated by the Commanding General's barring another advertising circular, The Extra, from door-to-door delivery upon his discovery that it was being delivered in that manner.
 
 
 19
 In sum, as the Supreme Court cautioned in Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 804, 105 S.Ct. 3439, 3450, 87 L.Ed.2d 567 (1985), "[i]n cases where the principal function of the property would be disrupted by expressive activity, [courts are] particularly reluctant to hold that the government intended to designate a public forum." (emphasis added). Significantly, the two examples cited in Cornelius were jails and military bases. Id. Appellant simply has not demonstrated that Camp Lejeune differs from other military bases in this respect.IV
 
 
 20
 The conclusion that Camp Lejeune's residential areas are non-public forums does not end the analysis. The Commanding General's refusal to permit door-to-door delivery of The Shopper in these areas must be shown to be reasonable if it is to pass First Amendment muster. The prohibition must be "viewpoint neutral" and "reasonable in light of the purpose served." Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451 (citing Perry, 460 U.S. at 49, 103 S.Ct. at 957).[8] Both requirements are met here. The Commanding General's restrictions are plainly viewpoint neutral. There is no evidence that he disagrees with the viewpoint expressed by the advertisements contained in The Shopper, nor is there any evidence that he agrees with the viewpoints expressed by advertisements contained in The Globe. Indeed, such endorsements would violate federal law. 32 C.F.R. Sec. 297.5(6)(i)(A) & (c)(1). Rather, the Commanding General has banned the door-to-door distribution of all newspapers, with the exception of the CEN, regardless of their content. Such an across-the-board bar is manifestly viewpoint neutral. See Greer, 424 U.S. at 838-39, 96 S.Ct. at 1217-18 (policy barring political speakers, regardless of their views, from military base did not violate the first amendment); United States v. McCoy, 866 F.2d 826, 834 (6th Cir.1989) (commanding officer has right to bar all speakers from military base); McGurran v. Veterans Admin., 665 F.2d 321, 322 (10th Cir.1981) (restricting placement of posters to bulletin boards was content neutral).
 
 
 21
 Providing The Globe with an exclusive right to deliver door-to-door is also reasonable. The Globe stands on a different footing from any other newspaper circulated at Camp Lejeune. It serves as the official means by which the Commanding General communicates with Camp Lejeune personnel and their families. The exclusive right to distribute door-to-door enables The Globe "to perform effectively" its "official responsibilit[ies]" at Camp Lejeune. Perry, 460 U.S. at 51, 103 S.Ct. at 958. We, therefore, agree with the Eleventh Circuit that such exclusive distribution rights are constitutional. See M.N.C. of Hinesville, Inc. v. United States Dept. of Defense, 791 F.2d 1466 (11th Cir.1986). There as here, a civilian publisher challenged the preferential distribution treatment accorded a CEN. On facts essentially similar to those at bar, the Eleventh Circuit held that the regulation permitting preferential distribution for the CEN was reasonable because it served to enhance the CEN's importance in the eyes of base personnel, thereby increasing its effectiveness as a means of communication. Simply put, " 'the CEN is the chosen mechanism by which the Army disseminates information to its troops.... One sure way the Army can distinguish for its troops the importance between the CEN and other news media is to distribute it through exclusive channels.' " M.N.C. of Hinesville, Inc., 791 F.2d at 1476 (quoting district court below).
 
 
 22
 The most significant justification for the exclusive distribution right is the crucial economic incentive it provides to civilian publishers. This economic incentive serves two important purposes. First, the monopoly directly affects the quantity of Camp editorial content contained in The Globe. As previously noted, the amount of editorial content in The Globe is proportional to the number of advertisements the civilian publisher sells. The more pages of The Globe that are printed, the more space is provided in which the Commanding General can communicate with Camp Lejeune personnel. And the number of pages printed depends on the number of advertisements sold. Since a monopoly on door-to-door distribution increases the number of advertisements sold by The Globe 's civilian publisher, it, therefore, increases the quantity of articles contained The Globe. See M.N.C. of Hinesville, Inc. at 1476-77. Second, the monopoly directly affects the quality of The Globe. The Globe, like all CENs, is published by a civilian publisher who is compensated solely through the sale of advertising. Publishers' bids are evaluated by the Commanding General in terms of their "competence, reliability, technical, production and business capabilities...." 32 C.F.R. Sec. 297, Encl. 2, p F(4). If The Globe is not an attractive financial investment for a civilian publisher, the Commanding General will receive fewer and less attractive bids. Since fewer favorable bids by less proficient publishers will lead to a less attractive publication, the quality of The Globe will suffer. In sum, this Court agrees with our sister circuit's conclusion that "the challenged preference is reasonable because it enhances the possibility that the Army will have an adequate supply of publishers when it solicits bids to publish a CEN." M.N.C. of Hinesville, Inc., 791 F.2d at 1477.
 
 V
 
 23
 In sum, undisputed record evidence amply supports the district court's conclusions (1) that Camp Lejeune base housing areas are non-public forums and (2) that the Commanding General acted reasonably in prohibiting the door-to-door distribution of The Shopper in these areas. Nothing more is required by the First Amendment in this special context.
 
 
 24
 AFFIRMED.
 
 
 
 [1]
 Civilian Enterprise Newspapers are free newspapers used by military commanders to communicate with personnel. 32 C.F.R. Sec. 297.3(b)(1). They are published by civilians at no cost to the military. 32 C.F.R. Sec. 297, Encl. 2, p A
 
 
 [2]
 New regulations governing military newspapers were promulgated in 1985. 32 C.F.R. Sec. 297 et seq. These regulations supersede and, in many respects, substantially differ from the old regulations. 32 C.F.R. Sec. 202 et seq
 
 
 [3]
 The Fifth Amendment claims were included in the notice of appeal, but not thereafter briefed or argued. Accordingly, these claims are waived because appellant did not comply with the requirements of Rule 28(a)(4), Fed.R.App.P., that appellant's brief "shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor...." See Northwest Acceptance Corp. v. Lynnwood Equipment, Inc., 841 F.2d 918, 923 (9th Cir.1988); Sanchez v. Miller, 792 F.2d 694, 703 (7th Cir.1986); Zuccarello v. Exxon Corp., 756 F.2d 402, 407-08 (5th Cir.1985); Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983); United States v. Robertson, 588 F.2d 575, 577 n. 2 (8th Cir.1978), cert. denied, 441 U.S. 945, 99 S.Ct. 2166, 60 L.Ed.2d 1048 (1979)
 
 
 [4]
 United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (grounds of the Supreme Court building); Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (university meeting facilities); Southeastern Promotions Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (municipal theater); City of Madison Joint School District v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1967) (school board meeting)
 
 
 [5]
 For examples of restrictions on non-public forums found to be reasonable, see Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (restricting access at prisons); Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (same); Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (restricting access on advertising space in city rapid transit cars; United States Postal Service v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (restricting access to post office boxes); Perry Educ. Ass'n v. Perry Local Educator's Ass'n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (school mailboxes)
 
 
 [6]
 See, e.g., United States v. Albertini, 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985); Brown v. Glines, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980); Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); United States v. McCoy, 866 F.2d 826 (6th Cir.1989); M.N.C. of Hinesville, Inc. v. United States Dept. of Defense, 791 F.2d 1466 (11th Cir.1986); Persons for Free Speech at SAC v. United States Air Force, 675 F.2d 1010 (8th Cir.1982) (en banc); United States v. Mowat, 582 F.2d 1194 (9th Cir.), cert. denied 439 U.S. 967, 99 S.Ct. 458, 58 L.Ed.2d 426 (1978)
 
 
 [7]
 Indeed, appellee conceded during oral argument that The Shopper could be delivered to the doors of Camp residents who specifically request it, in the same way that pizza is delivered to residents who request it
 
 
 [8]
 Appellant relies on a number of cases involving public forums in which the Supreme Court has found limitations on distribution or advertising to be unconstitutional. Lowell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); Schneider v. New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); Linmark Associates v. Township of Willingboro, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977). These cases have limited relevance for analyzing limitations in non-public forums such as Camp Lejeune