**PARK SHUTTLE N FLY, INC., Plaintiff,**

v.

**NORFOLK AIRPORT AUTHORITY, NORFOLK INTERNATIONAL AIRPORT, Defendant.**

**No. CIV.A. 2:03CV461.**

United States District Court, E.D. Virginia, Norfolk Division.

Dec. 9, 2004.

Steven R. Zahn, McGuirewoods LLP, Norfolk, VA, Theodore Frank Schwartz, Law Offices of Theodore F. Schwartz, Clayton, MO, for Plaintiff.

Anita Owings Poston, Vandeventer Black LLP, Norfolk, VA, for Defendant.

## MEMORANDUM OPINION AND ORDER

JACKSON, District Judge.

The Court held a bench trial in the above-captioned matter on September 9, 2004. Having conducted a trial and thoroughly reviewed the evidence, arguments, and records in this case, the Court finds that this case is ripe for decision. For the reasons stated below, the Court awards judgment for the **DEFENDANT**.

## I. PROCEDURAL HISTORY AND FACTUAL FINDINGS

### A. Procedural History

The Plaintiff, Park Shuttle N Fly, Inc. ("Park Shuttle"), brought suit on June 30,

2003 alleging that the Defendant, Norfolk Airport Authority ("Authority"), had imposed an invalid privilege fee upon it for its use of the airport's facilities. The complaint alleged violations of the Due Process, Equal Protection, and the Commerce clauses of the United States Constitution. The complaint stemmed from an Authority regulation imposed in May 2003 that required off-airport parking operators to pay a fee of 8% of the operators' gross monthly revenue for the privilege of accessing airport property to pick up or discharge customers. The Plaintiff alleged that this fee was different from the lump sum fee that other courtesy vehicle operators were required to pay, including hotels, taxis, and limousine services, among others. It also alleged that the amount of fee the Authority imposed was an "arbitrary, discriminatory, and artificial classification" that imposed an undue burden on interstate commerce and violated the due process and equal protection clauses of the Constitution. (Pl. Compl. at ¶ 11).

The Defendant filed a Motion to Dismiss on August 18, 2003 on the grounds that Plaintiff's complaint failed to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), and in the alternative for Summary Judgment on the Commerce Clause claim. On February 6, 2004 this Court granted Defendant's Motion to Dismiss Plaintiff's Equal Protection claim which alleged that Park Shuttle was treated differently than hotels, and the Due Process Claim. It denied Defendant's Motion to Dismiss the challenge to the amount of user fee charged and to the prohibition of Park Shuttle to pick up passengers which do not have prior arrangements with the company. It also denied the Motion to Dismiss and Summary Judgment on the Commerce Clause claim.

The Court also made several findings that are relevant to the analysis here.

The Court found that the revenues Plaintiff paid to Defendant constitute a usage fee rather than a state-imposed tax. *Park Shuttle N Fly, Inc. v. Norfolk Airport Auth.*, No. 2:03cv461, at *7 (February 6, 2004). In addition, the Court found that state law allows the Authority to impose usage fees of some kind, thus establishing a legitimate purpose for the regulation.

After the Court's decision, the Plaintiff filed its First Amended Complaint for Declaratory Judgment, Preliminary Injunction, Permanent Injunction and Other Relief ("Pl.Am.Compl."). The Amended Complaint reiterated the initial allegations regarding the Equal Protection, Due Process, and Commerce Clause claims, and added a claim alleging a violation of Free Speech and Equal Protection. The Plaintiff newly alleged that Defendant denied Plaintiff the opportunity to advertise in the concourses of the airport terminals, while other commercial entities were allowed to advertise.

## B. Factual Findings

### 1. Stipulated Facts

The Plaintiff, Park Shuttle is a duly organized and existing Virginia corporation engaged in the business of operating a parking lot in close proximity to the Norfolk International Airport ("Airport"), which parking lot is used by persons traveling in interstate commerce by using the flight facilities at said Airport. (Final Pre–Trial Order at ¶ 1). The Norfolk Airport Authority ("Authority") is a political subdivision of the Commonwealth of Virginia and is an independent body that owns and operates the Airport pursuant to state law and the Code and Charter of the City of Norfolk. For purposes of this litigation, the Authority operates in its proprietary capacity and not in its governmental or regulatory capacity. (Final Pre–Trial Order at ¶ 2). The Authority is governed by

a Board of Commissioners (the "Board"), which oversees the general operation and management of the Airport. At all relevant times, the Chairman of the Board is and has been Richard D. Roberts. As Chairman of the Board, Mr. Roberts is familiar with the overall operational, business, and financial aspects of the Airport and the Authority. Mr. Roberts presides at its meetings and activities. The other members of the Board are: Peter G. Decker, Jr., Esquire; Louis F. Ryan, Esquire; Thomas P. Host, III; Dr. Harold J. Cobb, Jr.; Robert D. Jack, Jr.; Gus J. James, II, Esquire; Robert T. Taylor; and Howard M. Webb, Sr. (Final Pre–Trial Order at ¶ 3). At all material times, the Executive Director of the Authority is and has been Kenneth R. Scott. As Executive Director, Mr. Scott is the highest-ranking employee and officer of the Authority. Mr. Scott reports to the Board. Mr. Scott is responsible for all day-to-day operations and management of the Airport, as well as strategic and financial planning. (Final Pre–Trial Order at ¶ 4).

The Airport is served by major airlines, including American, Continental, Delta, Northwest, Southwest, United, U.S. Airways, or their subsidiaries and affiliates. From 1998 through 2002, on average, approximately 3,079,470 passengers flew into and out of the Airport per year. This figure does not include people who come to the Airport to meet passengers or for other purposes. With the exception of 2001 (during which the September 11 terrorist attacks occurred), the number of passengers has increased every year. (Final Pre–Trial Order at ¶ 6). All passengers arriving at and departing from said Airport use automotive surface transportation for purposes of ingress and egress to and from the Airport facilities. (Final Pre–Trial Order at ¶ 7). Automotive surface transportation at the Airport, other than personal automobiles, consists of common carrier buses, limousines, taxi cabs, shut-

tles, and vehicles commonly denominated as "courtesy vehicles", which pick up and discharge customers of hotels, parking lots, motels, and car rental agencies. (Final Pre–Trial Order at ¶ 8).

A substantial portion of the traveling passengers using the facilities of the Airport reach the facilities by driving their automobiles or by taking limousines, taxi cabs, shuttles and courtesy vehicles. (Final Pre–Trial Order at ¶ 9). The Authority owns and operates the parking facilities located on Airport property. There are three parking lots and three parking garages on the Airport, containing a total of approximately 6,800 spaces. (Final Pre–Trial Order at ¶ 10).

At present, Park Shuttle operates the only known off-Airport parking facility. The Park Shuttle lot is located on Military Highway, approximately 1.5 miles from the main entrance to the Airport. (Final Pre–Trial Order at ¶ 11). The travelers who park their automobiles off the Airport on Park Shuttle's facility are then provided transportation to and from Park Shuttle's parking lot and the Airport by means of Park Shuttle's courtesy vehicles. Plaintiff's courtesy vehicles also transport its customers' luggage and drop off Park Shuttle's customers and luggage at the appropriate check-in and baggage check-in facility. The Authority's parking facility provides no such transportation of customers' luggage to the appropriate airline terminal. (Final Pre–Trial Order at ¶ 12). On an annual basis, more than 90% of Park Shuttle's revenues are generated from customers who are parking on Park Shuttle's property for the purpose of accessing the Airport and thereby traveling in interstate commerce. If the Airport did not exist, Plaintiff would have too few, if any, customers to operate its parking facility. (Final Pre–Trial Order at ¶ 13). Hotels located near the Airport provide cour-

tesy vehicles to transport customers to the Airport. (Final Pre–Trial Order at ¶ 14).

On May 22, 2003, at its regularly scheduled meeting, the Board of Commissioners of the Authority adopted the Resolution Establishing Regulations and Fees for Off–Airport Public Parking Operators at Norfolk International Airport ("Resolution"). (Final Pre–Trial Order at ¶ 15). The Resolution provides, among other things, that all off-Airport parking operators shall pay a fee of 8% of the operator's gross monthly revenue derived from its customers who are transported to or from the Airport (the "Privilege Fee") for the privilege of accessing Airport property to pick up or discharge customers. The Resolution went into effect on July 1, 2003. (Final Pre–Trial Order at ¶ 16). At present, the Privilege Fee does not apply to vehicles operated by hotels, or to limos, taxi cabs or any other private or public vans transporting passengers to the Airport. Rather, such other businesses pay a different permit fee. (Final Pre–Trial Order at ¶ 17). The Authority has imposed a privilege fee of 8% of gross revenues for off-Airport rental car companies. At present, all rental car companies are located on the Airport and pay fees pursuant to concession agreements with the Authority. However, the Privilege Fee would apply to vehicles operated by an off-Airport rental car company in the event such a company were to open for business. (Final Pre–Trial Order at ¶ 18). The Authority does not require itself to pay a percentage of its gross revenue as required by the Authority of Park Shuttle. (Final Pre–Trial Order at ¶ 19).

In establishing the Privilege Fee, the Authority considered several factors, including, among others, the following: a) under federal law, and under mandates from the Federal Aviation Administration ("FAA") imposed pursuant to such law, the Airport is required to be self-sustaining. These requirements are also contained in the FAA Grant Assurances by which the Authority is bound. Thus, the Authority must maximize revenue in order to comply with these federal mandates; b) in order to attract airlines and maintain service, the Airport's rates and charges to airlines must be competitive; c) the Authority's expenses to operate the Airport have been increasing every year for the past five years. From fiscal year 1998–1999 through fiscal year 2002–2003, the Authority's expenses increased by approximately 7.6% annually. (The Authority fiscal year runs from July 1 through June 30.) The projected expenses for fiscal year 2003–2004 are expected to increase 42% over fiscal year 2002–2003; d) the predominant reasons for the increases in the Authority's expenses are the expansion of the Airport to accommodate the increasing volume of passengers and the additional security measures required as a result of the terrorist attacks of September 11, 2001. The Authority's only enterprise is the Airport; it does not have other businesses to offset such increased expenses; e) the Authority elected to impose the Privilege Fee in the form of a percentage of gross revenue because an increase in the receipts of an off-Airport parking operator corresponds to increased use of the Airport's facilities by the off-Airport parking operator; f) in selecting the 8% figure for the Privilege Fee, the Authority found that it was within the range charged by other airport operators, some of whom charge as much as 10%; g) the information on other airports was obtained from a survey entitled "2002 Ground Transportation Vehicle Fees Paid to Airports" compiled by the Airport Ground Transportation Association ("AGTA"), under the supervision of Ray Mundy, Ph.D., of the University of Missouri at St. Louis Center for Transportation Studies. The survey reveals that at

least 16 airports across the United States charge percentage-based fees ranging from 4% to 10% to off-airport parking operators; h) the AGTA is a national organization comprised of major airport operators, ground transportation service providers, and manufacturers of ground transportation vehicles; i) also, in 2000, the Authority commissioned Leigh Fisher Associates, an airport management consulting firm, to study the types of fees charged to off-airport parking operators. The Leigh Fisher study also concluded that the range of fees charged by other airports was from 4% to 10%; j) in addition, the Authority considered that the vast majority, if not all, of Park Shuttle's customers are derived from the Airport; k) the Authority considered that Park Shuttle's marketing and advertising efforts, on their face, attempt to connect Park Shuttle with the Airport. For example, Park Shuttle's roadside billboard and the sign at its facility feature the phrase "Airport Valet Parking." Likewise, Park Shuttle's newspaper advertisements use the words "Airport Parking;" l) Park Shuttle has chosen to inextricably link itself to the Airport and has obtained its customers from the Airport; m) Park Shuttle not only uses the actual Airport roads, but Park Shuttle also benefits from the Airport as a whole in terms of its customer base and revenue source; n) other businesses such as hotels, limousines, and taxis, have other sources of revenue. For example, hotels exist primarily to provide lodging and conference services, and transportation between the hotels and the Airport is generally complimentary; o) the Authority does not provide the services offered by these other businesses, while the Authority does provide Airport parking; p) Park Shuttle's business is materially different from hotels, motels, taxicabs and limousine operators in that Park Shuttle's primary purpose is to provide parking, while the other businesses have primary purposes other than parking; q) other businesses such as hotels enhance the flow of passengers through the Airport by hosting conferences and by providing lodging for travelers. Off-airport parking operators such as Park Shuttle have the opposite effect: they compete directly with the Authority; r) at present, the Authority has excess parking capacity on average of at least 2000 spaces per day; s) in deciding to impose the Privilege Fee, the Authority also considered its need to retire debts incurred in connection with the operation and maintenance of the Airport; t) those who use the Airport for commercial purposes, such as off-Airport parking operators, cause the Authority to incur costs associated with maintaining and securing the terminals, gates, roadways, and other facilities used by such businesses. The Authority believes that such commercial users should pay for the privilege of using the Airport for commercial purposes and for the market generated by the Airport's existence and continuing operation. (Final Pre–Trial Order at ¶ 20).

Prior to adopting the Resolution imposing the Privilege Fee, the Authority provided written notice to those who would be affected, including Park Shuttle, and conducted a public hearing at a meeting of the Board's Ground Transportation Committee. In response to the notice, Park Shuttle's out-of-state counsel sent a letter to the Authority outlining various legal challenges and objections to the Privilege Fee. (Final Pre–Trial Order at ¶ 21). Mr. Ben Gordon and another Park Shuttle representative, Ms. Janet Ayers, were invited to and appeared at a meeting held on May 13, 2003 by the Board's Ground Transportation Committee. At this meeting, the Ground Transportation Committee, chaired by Mr. Peter G. Decker, Jr., received and considered the comments presented by Mr. Gordon and Ms. Ayers.

(Final Pre–Trial Order at ¶ 22). The Ground Transportation Committee discussed the issue and voted unanimously to recommend the imposition of the Privilege Fee to the full Board. The Board adopted the Resolution upon the recommendation of the Ground Transportation Committee after due consideration of all the facts stated above. (Final Pre–Trial Order at ¶ 23).

Peter B. Mandle is an expert in the field of airport management. Mr. Mandle has more than 25 years of experience in traffic engineering and transportation planning, with emphasis on airport grounds transportation, parking, airport access and circulation, and other airport management-related areas. Mr. Mandle is employed by Leigh Fisher Associates. Mr. Mandle is generally familiar with operations of airports in the United States and the commercial grounds transportation management and business practices at such airports. (Final Pre–Trial Order at ¶ 24). Mr. Mandle evaluated the Privilege Fee imposed by the Authority and the circumstances under which it was enacted. Mr. Mandle also analyzed off-airport parking fees charged by other airports. Mr. Mandle's research and analysis of the foregoing is contained in a report title "Evaluation of Off–Airport Parking Lot Privilege Fees", dates June 10, 2004 (the "Mandle Report"). (Final Pre–Trial Order at ¶ 25).

The fees charged by airports to commercial ground transportation operators fall into four general categories: privilege fees; cost-recover fees; monthly or annual fees; and other fees, such as those based on vehicle size or waiting time. (Final Pre–Trial Order at ¶ 26). Approximately 21 U.S. airports require that operators of off-airport parking facilities pay a privilege fee. As shown in Table 1 of the Mandle Report, these airports range in size from those serving fewer than 500,000 originat-ing airline passengers to those which serve over 11 million originating airport passengers. (Final Pre–Trial Order at ¶ 27). As shown in Table 1 of the Mandle Report, the privilege fees range from 1% to 10% of gross receipts, with twelve airports charging 8% or higher. All of the 21 airports that charge off-airport parking operators privilege fees charge them as a percentage of gross receipts. (Final Pre–Trial Order at ¶ 28).

The factors typically considered by airport managers in assessing a privilege fee on off-airport parking operators are: the fees charged other companies, such as rental car companies, providing transportation services; the amount of off-airport parking lot privilege fees charged at other airports; and the amount of fees charged other airport concessionaires. (Final Pre–Trial Order at ¶ 29). As stated in Table 2 of the Mandle Report, eight of the airports similar in size to the Airport considered fees charged by other airports as a factor in establishing the off-airport parking privilege fee. (Final Pre–Trial Order at ¶ 30).

From time to time, various commercial enterprises purchase and pay for advertising space in the Airport terminal and passenger concourses in the Airport facility. (Final Pre–Trial Order at ¶ 31). In September 2000, Park Shuttle made application to the Authority for permission to place commercial advertising in the passenger concourses of said Airport. (Final Pre–Trial Order at ¶ 32). On September 29, 2000, Park Shuttle received a letter from Kenneth Scott, the Authority's Executive Director, stating that the Airport would not allow Park Shuttle any advertising in the passenger terminal area. However, Mr. Scott indicated that Park Shuttle could have a listing and a telephone line on the Reservation Board in the Baggage Claim Lobby. (Final Pre–Trial Order at ¶ 33). In January 2004, Park Shuttle

again made application, through Interspace Airport Advertising Co., to place Park Shuttle's advertising in the Airport terminal. (Final Pre–Trial Order at ¶ 34). On February 6, 2004, Park Shuttle received a letter from Mr. Scott denying the application of Park Shuttle to advertise in the concourses of the terminal. (Final Pre–Trial Order at ¶ 35).

The Airport is not a public forum for purposes of restrictions on speech under the First Amendment. (Final Pre–Trial Order at ¶ 36). The advertisement that Park Shuttle desires to place in the airport does not express any particular political or social viewpoint or idea. (Final Pre–Trial Order at ¶ 37). In seeking to advertise on the airport premises, Park Shuttle's intent is to attract more customers to its parking lot. (Final Pre–Trial Order at ¶ 38).

### 2. Additional Trial Factual Findings

The Defendant has a legitimate business interest to protect its sources of income. Park Shuttle is a direct competitor with the Authority. The Defendant decided to impose a privilege fee based on information from an AGTA study, the Leigh Fisher study regarding off-airport parking fees, and similar airport administrators. A privilege fee is a fee based upon the benefits a company receives from the entire existence of the airport. It differs from a permit fee or cost-recovery fee that is imposed for courtesy vehicles. The privilege fee is not based on any estimate of Plaintiff's actual use of the airport or any of the Authority's facilities, or on Defendant's lost revenue due to Plaintiff's business. It is greatly in excess of the fees imposed on hotel shuttle vans and taxicabs that provide transportation to or from the airport. The privilege fee is within the range of 4–10% that the Leigh Fisher study identified for establishing a privilege fee. The privilege fees imposed at other airports for off-airport parking companies also fall within this range. In-

stead of a privilege fee, many airports charge off-airport parking companies an annual permit fee or have standard fees unrelated to the companies' revenue. The particular characteristics of an airport have some bearing on the type and amount of fee imposed based on the relative benefits conferred by the airport and the parking operators. At the Norfolk International Airport, the Authority is currently able to meet the parking needs of its customers.

The advertisement cases for which the Plaintiff sought access are in the main concourses of the airport, and contain paid advertisements by commercial companies, including some of the hotels that offer courtesy vehicle services to the airport. The principal purpose of the advertising display cases is to generate revenue for the Authority. (Tr. at 69.) In this case, applications were submitted in 2000 and 2004 to Mr. Scott to place advertisements. The Authority's procedure was to have the Board approve any prospective advertiser, and then approve any prospective advertisements to be placed within the airport. (Tr. at 69.) The Board delegated preliminary decision-making authority to Mr. Scott, but generally the advertising was coordinated by Interspace Airport Advertising Company. (Tr. at 70.) The Board did not have any written policy regarding advertising on the airline concourses.

Based on what he considered a general policy direction from the Board, Mr. Scott rejected Plaintiff's requests. (Tr. at 35.) Generally, he interpreted that policy to disallow any offensive advertisement, tobacco or alcohol ads, and to disallow any advertising for companies in competition with the Authority or the airlines present at the Norfolk International Airport. For example, airlines that do not service the Norfolk International Airport are not allowed to place advertisements at the air-

port. (Tr. at 37.) The Authority policy also applies to off-airport rental car companies, and thus Mr. Scott inferred that the policy would also likely apply for an off-airport parking company such as Park Shuttle. The purpose of this restriction was to avoid diversion of revenue from the airport or concessions within it. The Plaintiff's request to advertise in the airport concourse was denied because Plaintiff is a direct competitor and the airport provides comparable parking facilities. Defendant's sole reason for denying Plaintiff's advertisement was to protect its market share. (Tr. at 94.)

The Authority has an appeal process by which a prospective advertiser can appeal an initial rejection decision. (Tr. at 36.) Park Shuttle did not appeal Mr. Scott's decision, nor were they notified of the appeal process. (Tr. at 104.) After the second application to advertise was rejected, counsel for Park Shuttle made a written request for an explanation for the rejection of the application. Mr. Scott did not consider Park Shuttle's counsel's letter to be an appeal, and Park Shuttle did not get a response.

## II. CONCLUSIONS OF LAW

■ A plaintiff alleging a violation of Equal Protection under the Fourteenth Amendment must first show that the government treated it differently than other individuals or groups. If the government action neither discriminates based on a suspect classification nor impinges a fundamental right,[1] the Defendant must assert a legitimate purpose for treating the Plaintiff different from other similarly situated individuals or groups. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84, 120 S.Ct.

631, 145 L.Ed.2d 522 (2000). For a mere economic regulation, the government need only show a rational basis for its action. *Williamson v. Lee Optical*, 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955). The Plaintiff bears the ultimate burden of proving that the government's disparate treatment was so unrelated to the proffered purpose that it was irrational. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *Eldridge v. Bouchard*, 645 F.Supp. 749, 755 (W.D.Va.1986).

■ The Commerce Clause prohibits a state from enacting any regulation that places an undue burden on interstate commerce. U.S. CONST. ART. I, SECT. 8., CL. 3. The actions of the state are treated as correct, unless they are proven to be unreasonable and arbitrary. *Hendrick v. Maryland*, 235 U.S. 610, 624, 35 S.Ct. 140, 59 L.Ed. 385 (1915). A government fee is reasonable if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce. *Evansville–Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 716–17, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972).

■ The First Amendment generally prohibits certain government restrictions on speech. U.S. CONST. AMEND. I; *Gitlow v. People of New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). Regulations restricting speech on government property must be analyzed using the public forum doctrine. If the property is a traditional public forum or a designated public forum, a content based regulation

---

**1.** The Supreme Court has identified several suspect categories for which a higher level of scrutiny applies. If the alleged discrimination is based on race, national origin, alienage, sex, or illegitimacy, or involves a deprivation of the fundamental rights of travel, voting, or raising one's family, the court must apply either strict or intermediate scrutiny. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439–41, 105 S.Ct. 3249, 87 L.Ed.2d 313(1985).

must "serve a compelling state interest" and be "narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In a non-public forum, the regulation must be reasonable and not just an attempt to suppress the prospective speaker's point of view. *Id.* Speech on government property is subject to a lower level of First Amendment scrutiny when the government is acting in a proprietary rather than regulatory manner. *United States v. Kokinda,* 497 U.S. 720, 725, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). Regulations restricting commercial speech must be analyzed according to the doctrine established by *Central Hudson.* A regulation on commercial speech is valid if: 1) the speech concerns lawful activity and is not misleading, 2) the asserted governmental interest is substantial, 3) the regulation directly advances the governmental interest asserted, and 4) it is not more extensive than is necessary to serve that interest. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

## III. ANALYSIS

### A. Equal Protection

█ Plaintiff asserts varying equal protection violations.[2] First, the Plaintiff alleges that the imposed privilege fee unconstitutionally discriminates against Park Shuttle because the type and amount of rate charged differs from the rate charged to every other type of courtesy vehicle company. The Defendant claims that it has legitimate reasons for imposing a type of privilege fee different from the fee imposed on other courtesy vehicle companies. The Court previously found that at least one legitimate basis for Defendant's classification did exist, protecting a source of its income. Park Shuttle's parking business does take away revenue that would otherwise go to the Authority, whereas hotels are in a completely different business. *Park Shuttle N Fly, Inc. v. Norfolk Airport Auth.,* No. 03cv461 (E.D.Va. Feb. 6, 2004) (order partially granting Motion to Dismiss). Thus, the Authority can legitimately classify Park Shuttle differently because it is a revenue generating entity that can act to protect its source of revenue. The question currently before the Court is whether the amount of the privilege fee imposed on Park Shuttle is related to that legitimate government objective. *See id.*

The Plaintiff argues that the 8% privilege fee is arbitrary, not based on any determination of the revenue lost by the airport, and not based on Park Shuttle's actual use of the Authority's facilities. The Defendant contends that the 8% privilege fee was determined in several, non-arbitrary ways. First, the Authority, led by Mr. Scott, contacted directors at other airports including the Raleigh–Durham airport, and the Columbus, Ohio airport to determine what type of payment structure they used. (Tr. at 60.) He was informed that the Raleigh–Durham airport imposes a 10% privilege fee, and the Columbus airport a 7–8% fee for off-Airport parking services. (Tr. at 62.)

Second, Mr. Scott relied on information provided by Leigh Fisher, an airport management consulting firm. In 2000, the Authority contacted the firm requesting

---

**2.** The Plaintiff argues in prior briefs that the provision of the Resolution that prohibits Plaintiff from picking up passengers that do not have a prior arrangement with Park Shuttle violates the Equal Protection Clause. It also mentions the provision in its Proposed Findings of Fact. The issue is not properly before the Court, however, because it is not raised in Plaintiff's First Amended Complaint. In addition, Plaintiff did not present any evidence on the issue at trial. The Court therefore declines to issue a ruling regarding the aforementioned provision.

information regarding the types of fees charged to off-airport parking operators. (Ex. 10). Leigh Fisher responded that there were three types of fees applicable to off-airport parking facilities: permit fees, cost-recovery fees, or privilege fees. (Tr. at 128.) Mr. Peter Mandle, an expert consultant from Leigh Fisher, testified that a permit fee usually applies to commercial vehicles such as taxis or limousines, and it is an annual or monthly fee based on obtaining a license. Each commercial operator is required to pay such a fee. A cost-recovery fee applies to commercial vehicles and is a fee to reimburse the airport for the cost of building, operating, or maintaining facilities used by those vehicles. Cost-recovery fees can be assessed per vehicle, per operator, per vehicle trip, per passenger, or another measure of the actual use of the airport facilities. A privilege fee is assessed for the privilege of doing business on airport property and from the benefits a company or vehicle operator derives from the presence of the entire airport. Leigh Fisher also reported that the privilege fees charged at other airports range from 4% to 10% for off-airport parking businesses. (Ex. 10).

Third, Mr. Scott testified that he determined the fee based on the 2002 Airport Ground Transportation Association ("AGTA") study regarding ground transportation vehicle fees paid to airports. (Tr. at 58.) The study surveyed various airports around the country, and tabulated the information regarding fees imposed for on and off airport rental car companies, on and off airport parking operators, as well as fees for other commercial vehicles such as taxis and limousines. (Ex. 33). Finally, in determining what type and amount of fee to impose, Mr. Scott also considered the fact that off-airport rental car companies were previously charged an 8% privilege fee for their use of the airport.

The Court finds that the privilege fee imposed on Park Shuttle is substantial in comparison to other commercial vehicle operators. For the months of July through December 2003, Park Shuttle paid an average of $2,269.09 per month as a privilege fee. Similarly, it paid an average of $2,137.84 for the first five months of 2004. Taxicabs, in comparison, are charged a fee of $15 per month to pick up passengers at the airport, and they must be registered in Norfolk. There is no charge to drop off passengers. (Ex. 19). The Authority also provides taxis with a holding area for operators to park and wait for customers. (Tr. at 16–17.) Limousines are not charged a fee to pick up passengers at the airport, but they must have a pre-arranged agreement with the customer. (Ex. 19).[3] Hotels are charged an annual permit fee of $180 per year to pick up customers who call to be picked up at the airport. (Tr. at 21.)

To find that this type of governmental action violated the Equal Protection Clause, the Court must determine that officials reasonably could not have believed that the action was rationally related to a legitimate governmental interest. *Front Royal County Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 290 (4th Cir.1998); *Star Scientific v. Beales*, 278

---

**3.** The contract limousine service whereby customers have a pre-arranged agreement with the company does not have to pay a fee to pick up and drop off passengers. The common carrier service that also provides limousine transportation does have to pay a fee of 12% of its annual revenue to the authority. (Tr. at 26.) The common carrier provides on-site walk-up service that does not require an advance arrangement. Customers of this service travel with other passengers going to nearby areas throughout the Hampton Roads area. For example, passengers going to downtown Norfolk ride in one vehicle, and passengers going to the ocean front ride together in another vehicle.

F.3d 339, 351 (4th Cir.2002). Park Shuttle must therefore show that no reasonable official could have believed that the amount of the privilege was rationally related to the purpose of protecting the Authority's revenue. The Plaintiff has not met this burden. The Defendant, Norfolk Airport Authority, concedes that the fee imposed on Park Shuttle exceeds that imposed on other commercial vehicle operators, and concedes that it bears no relationship to either the cost of building or maintaining the airport or its roadway facilities. It is also irrelevant that the fee was not necessarily imposed due to lost revenue from parking, but instead due to increased security costs. The privilege fee is nevertheless rationally related to the legitimate purpose of protecting its revenue because the Authority has a right to charge commercial operators for the benefit and use of its facilities, and the amount of the fee is rational.

Park Shuttle generates more than 90% of its revenue from customers that access the airport. (Final Pre–Trial Order at ¶ 13). The vast majority of its business, therefore, is a direct result of the existence and operation of the airport. A benefit of this nature is specifically the type contemplated by the percentage based privilege fee. As Mr. Mandle testified, the privilege fee is designed to exact payment when a company benefits from the existence of the entire airport, as Plaintiff does here. Plaintiff concedes that without the airport, it would have too few customers to operate the parking facility. (Final Pre–Trial Order at ¶ 13).

Defendants conducted a reasonable inquiry into procedures used by other similar airports, and confirmed these results by the Leigh Fisher firm. (Tr. at 55.) It then established a fee squarely within the range suggested by Leigh Fisher, and comparable to other airports. (Ex. 33). The privilege fee structure is used in airports around the country for commercial businesses similar to Plaintiff's. Of the fifty-two airports surveyed in the 2002 AGTA study that charge off-airport parking fees, seventeen charged by percentage of gross revenue, and thirty-five either imposed no fee or charged using other methods.[4] All of the airports using percentage-based fees had rates between the 4 and 10% indicated by Leigh Fisher.

The Defendant's rate also accounts for the relative benefits the Plaintiff and the Authority receive. Courts have upheld similar percentage-based fee structures based on an entity's comparison of the relative benefits it receives from various entities. *See Alamo Rent–A–Car, Inc. v. Sarasota–Manatee Airport*, 825 F.2d 367, 371–72 (11th Cir.1987) (finding privilege fee charged to off-airport rental car company constitutional). The AGTA did not include a consideration of the relative benefits of an off-airport parking facility, but such information is very relevant to decisions based on what fees to charge particular entities.

The Norfolk International Airport has approximately 6,800 parking spaces, and expects to be able to meet the parking demands of its customers for several years. (Tr. at 52.) It, therefore, does not currently have a particular need for off-airport parking services. Other airports that do have such a need based on limited parking facilities at the airport likely have a greater need for such companies. These airports derive a greater benefit from off-airport parking entities than does Defen-

---

**4.** The Defendant references the "Mandle Report" in their Post–Trial Brief that counts 21 airports that impose a percentage based privilege fee between the range of 1–10%. The Court does not have a copy of this report, however, as it was apparently not admitted into evidence.

dant, and thus may vary the fees based on entirely different criteria. In addition, under the percentage based fee, increased revenue from Park Shuttle corresponds with increased usage of the airport, and thus Plaintiff pays more for the increased benefits it receives. The Authority does not have to show that the fee is the same as other airports, nor must it justify why some of Plaintiff's revenue is not exempted from the fee structure.[5] It must merely show that the fee is rational based on the relative benefits and detriments it derives based on the operation of Plaintiff's business. *See Alamo Rent–A–Car*, 825 F.2d at 372.

Park Shuttle has presented no evidence on benefits it provides to the Authority, whereas the Authority shows that Park Shuttle derives enormous benefits from the airport. Almost all of its revenue is generated because of the airport, and the Authority can constitutionally impose a different fee as a result. *See Williamson*, 348 U.S. at 489, 75 S.Ct. 461; *Allied Stores v. Bowers*, 358 U.S. 522, 526–27, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959) (finding states can vary the rates of taxes and fees based on legitimate classifications). Thus, even though Plaintiff is charged a much higher rate for essentially the same use of the airport, the Defendant's determination of relative benefits from Plaintiff as compared to similar commercial operators justifies the discrepancy, especially given the wide latitude governmental entities enjoy in determining the type and amount of fees charged for their services. *See City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). It is therefore rational for Defendant to charge a different, percentage-based fee to companies such as Park Shuttle that operate almost exclusively to supplement the airport's existing services.

■ Second, the Plaintiff raises an Equal Protection challenge to Defendant's advertising policy which disallows Park Shuttle to place advertisements in the main concourses where other advertisements are located. Because Plaintiff's proposed advertisements are purely commercial, the Court will apply the rational basis test. *City of New Orleans*, 427 U.S. at 303, 96 S.Ct. 2513 ("When economic or commercial legislation is challenged under the equal protection clause, the state defendant needs only to demonstrate that the regulation is rationally related to a legitimate state interest."); *Norfolk Fed'n of Bus. Dist. v. Dep't of Hous. and Urban Dev.*, 932 F.Supp. 730, 738 n. 4 (E.D.Va. 1996). Having found that Defendant has a legitimate business interest in classifying Plaintiff differently, the Court must only consider whether the restriction is rationally related to that interest. Here, again, Defendant classifies Plaintiff as a competing entity, and therefore prohibits the commercial advertisements. In a commercial arena, where the government is acting as a proprietor, it is reasonable for the government entity to discriminate against its competitors in establishing regulations. The Authority is rationally distinguishing Plaintiff in an attempt to maximize its profits at the airport which serves the public, and the Court cannot consider the economic fairness to Plaintiff if the classification is rational. *See Nat'l Paint & Coatings Ass'n. v. City of Chicago*, 45 F.3d 1124, 1127 (7th Cir.1995). The Court finds that Defendant's rejection of Plaintiff's advertisements is therefore rationally related to its legitimate interest of generating and

---

**5.** The Plaintiff presented information that the privilege fee for off-airport rental cars was imposed only on revenues above a certain amount. Thus, the first $50,000 of their revenue was exempted from the 8% fee. (Tr. at 76.)

protecting revenue. Plaintiff's Equal Protection claim, therefore, fails.

## B. Commerce Clause

■ The Plaintiff alleges that the Norfolk Airport Authority's privilege fee unconstitutionally interferes with interstate commerce by forcing airline passengers to pay additional fees. The Court has determined that the Authority's fee requirement is a user fee rather than a tax imposed upon Plaintiff. As such, the Court uses the analysis from *Evansville–Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.* 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972). A state may exact reasonable compensation for the use of those engaged in interstate commerce. *Id.* at 712, 92 S.Ct. 1349 (quoting *Hendrick v. Maryland,* 235 U.S. 610, 35 S.Ct. 140, 59 L.Ed. 385 (1915)). A fee is reasonable if it is based on some fair approximation of the use of the facilities, it is not excessive in relation to the benefits conferred, and it does not discriminate against interstate commerce. *Northwest Airlines v. County of Kent, Michigan,* 510 U.S. 355, 369, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994); *Evansville–Vanderburgh,* 405 U.S. at 716, 92 S.Ct. 1349.

■ The Plaintiff claims that the Authority's fee is not based on any fair approximation of the use of the facilities involved. Park Shuttle argues that its use of the airport is limited to the access roads and driveways of the airport, and that it should not be charged based on its use of the entire airport. The Defendant responds that Plaintiff benefits from the entire existence of the airport and uses its passengers who by extension use the entire airport. Defendant's argument is consistent with arguments made in other federal courts considering the constitutionality of similar fees. *See Alamo Rent–A–Car v. Sarasota–Manatee Airport Auth.,* 906 F.2d 516, 519 (11th Cir.1990) ("*Alamo II* ").

■ The user fee is unquestionably inexact. Plaintiff is charged an 8% privilege fee regardless of how many customers park each month to access the airport. The fee also applies regardless of how many trips Plaintiff actually makes to the airport to pick up or drop off passengers. It also applies regardless of how many passengers use each parking spot at the facility, and how long each passenger parks the car. Thus, Defendant receives the same amount from Plaintiff whether one passenger parks one car for ten days and Park Shuttle makes a total of two trips to the airport, or whether ten passengers park ten cars for one day each and Park Shuttle makes twenty separate trips to the airport. At the same time, the hotels are charged the same, exponentially lower rate regardless of how many customers arrive via the airport, and how many trips their shuttle buses make to the airport. But, the user fee is not required to be exact, it just cannot be "manifestly disproportionate to the services rendered." *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 620–23 n. 12, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981).

■ According to Park Shuttle's financial statements, it paid a total of $11,500.27 to the Defendant for the last six months of 2003. The Plaintiff has presented no information about the number of trips it made to the airport throughout those six months. The Plaintiff does, indicate, however, that over 90% of its revenue is generated by customers who seek access to the airport. The Plaintiff therefore gains enormous benefits from the existence of the airport and from passengers using its facilities. As long as a user fee is "based on some fair approximation of use or privilege for use, ... and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will

pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users." *Alamo II*, 906 F.2d at 519 (quoting *Evansville Vanderburgh*, 405 U.S. at 716–17, 92 S.Ct. 1349). Although the user fee is not based upon an approximation of use, it is based on an approximation of Plaintiff's privilege for use of the facilities. In addition, though it may be deemed excessive in comparison with other commercial vehicle operators, the fee is not excessive when compared to the benefit the Authority confers. The Defendant allows Plaintiff access to its facility to directly compete with Defendant's own parking facilities, and earn revenue that would otherwise go to Defendant. Plaintiff may argue that some customers prefer the door-to-door service offered by Park Shuttle, but it cannot refute the enormous benefits it receives because of the Defendant, and because of the access Defendant allows to its facilities. The Court therefore finds that the privilege fee is not excessive in comparison with the government benefit conferred, and is based on a fair approximation of Plaintiff's privilege for use of the airport.

Finally, the regulation does not discriminate against interstate commerce. The regulation imposes a percentage fee without respect to the destination of airport customers. As such, it meets the requirements of *Evansville–Vanderburgh*, and does not unconstitutionally violate the Commerce Clause.

## C. Freedom of Speech

The Plaintiff alleges that the Norfolk Airport Authority unconstitutionally violates Park Shuttle's rights under the First Amendment by disallowing it to advertise on the airport concourse while other companies are allowed to advertise. The Norfolk International Airport terminals contain advertisement spaces on which various companies pay to place advertisements. The Authority controls access to these advertisement spaces and refuses to allow Plaintiff to place advertisements on the spaces because it considers Park Shuttle to be a competitor.

Where a plaintiff challenges a regulation of commercial speech on government property, the Court must determine how to apply the Supreme Court's two different free speech doctrines. In considering such a case, the United States Court of Appeals for the Fourth Circuit applied the first prong of the *Central Hudson* test to determine whether the commercial speech is granted any First Amendment protection, and then applied the *Perry* public forum analysis. *Shopco Distrib. Co., Inc. v. Commanding General of Marine Corps Base, Camp Lejeune, North Carolina*, 885 F.2d 167, 171 (4th Cir.1989) (applying commercial speech doctrine only to determine whether the speech concerned lawful activity and was not misleading, then applying public forum doctrine). This analysis is comparable to the analyses used by other courts. In cases considering both speech in airports, and commercial speech in similar public facilities, most courts apply the public forum doctrine. *See Air Line Pilots Ass'n Int'l v. Dep't of Aviation*, 45 F.3d 1144 (7th Cir.1995); *Lebron v. Nat'l R.R. Passenger Corp. (Amtrak)*, 69 F.3d 650 (2d Cir.1995); *Change the Climate, Inc. v. Mass. Bay Transp. Auth.*, 214 F.Supp.2d 125 (D.Mass.2002); *Capital Leasing of Ohio, Inc. v. Columbus Mun. Airport Auth.*, 13 F.Supp.2d 640, 659 (S.D.Ohio 1998). Other courts have relied exclusively upon the commercial speech doctrine, however, *See New York Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 130 (2d Cir.1998)(applying commercial speech doctrine); *Am. Future Sys., Inc. v. Penn. State Univ.*, 752 F.2d 854, 862–62 (3d Cir.1984) (applying commercial speech doctrine because college dorm room didn't

**704**

qualify as either a public forum or non-public forum).

Using the analysis from *Shopco Distribution,* the Court must first determine if the commercial speech concerned lawful activity and was not misleading. 885 F.2d at 171. Neither the Plaintiff nor Defendant has argued that Plaintiff's proposed advertisement was misleading or concerned unlawful activity. The Court therefore finds that the proposed speech does fall under the First Amendment protections for commercial speech. *See Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. The Court must next apply the First Amendment doctrine concerning speech on government property.

 To scrutinize government regulation of speech on government property using the public forum doctrine, the Court must first determine what property is sought to be used for the prohibited speech. If a speaker seeks only limited access to a public facility, the relevant forum is that property for which access is sought. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 801, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Air Line Pilots,* 45 F.3d at 1151. In *Air Line Pilots,* the court drew a distinction between a diorama display case and the greater airport terminal that would be used for the distribution of literature. 45 F.3d at 1153 (citing *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) and *Planned Parenthood Ass'n v. Chicago Transit Auth.,* 767 F.2d 1225, 1231 (7th Cir.1985) (considering only the advertising system of the Chicago Transit Authority)). Similar to the facts in *Lehman* and *Air Line Pilots,* Plaintiff seeks limited access to the public property, *Lehman,* 418 U.S. at 301–02, 94 S.Ct. 2714; *Air Line Pilots,* 45 F.3d at 1151, so the relevant forum is just the advertising display cases. In considering prohibited speech involving public

transportation facilities, other courts have similarly limited their inquiry to a consideration of only the space in which the prohibited speech was to occur. *See Amtrak,* 69 F.3d at 655–56; *Hubbard Broad., Inc. v. Metro. Sports Facilities Comm'n,* 797 F.2d 552, 555–56 (8th Cir.1986); *Change the Climate,* 214 F.Supp.2d 125. *But see, U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States,* 708 F.2d 760, 764–66 (D.C.Cir.1983)(considering airport as a whole rather than just the advertising spaces). Since the Plaintiff here seeks only to place a commercial advertisement on the advertising boards, the Court concludes that the terminal advertising space is the relevant forum to consider.

Secondly, the Court must classify the public facility where the speech is purportedly being restricted either as a public forum, a limited or designated public forum, or a non-public forum. *Perry,* 460 U.S. at 44, 103 S.Ct. 948. Courts have generally found that an airport terminal is not a public forum. *Int'l Soc'y for Krishna Consciousness v. Lee,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992); *Jamison v. City of St. Louis,* 828 F.2d 1280, 1283 (8th Cir.1987); *Gannett Satellite Info. Network, Inc. v. Berger,* 894 F.2d 61, 64–65 (3d Cir.1990). The parties here have stipulated that the airport is not a public forum for purposes of restrictions on speech under the First Amendment, (Final Pre–Trial Order at ¶ 36), but they are silent as to whether it is a designated public forum. However, the relevant inquiry is whether the advertisement space, not the entire airport, constitutes a public forum, a designated public forum, or a non-public forum.

A public forum is government property that has "as a principal purpose ... the free exchange of ideas," such as a park, or sidewalk. *Cornelius,* 473 U.S. at 800, 105

S.Ct. 3439. To determine whether certain property is a public forum, the Court considers: 1) the physical characteristics of the place, 2) the function of the property, and 3) the degree of incompatibility between the challenged speech and the normal activities of the place. *Lehman*, 418 U.S. at 303–04, 94 S.Ct. 2714. The advertisement spaces are clearly not a public forum. Their principal purpose is to generate revenue, rather than to promote the free exchange of ideas.

On the other hand, a designated public forum is property that the government "has opened for use by the public as a place for expressive activity." *Perry*, 460 U.S. at 46, 103 S.Ct. 948. City auditoriums and public theaters are common examples of designated public fora. *Gannett*, 716 F.Supp. at 148. To determine if the space qualifies as a designated public forum, the Court must look at the government's intent in establishing and maintaining the advertising space. *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439. To determine intent, the Court looks at the policy and practice of the government with respect to the property, and then the nature of the property and its compatibility with expressive activity. *Air Line Pilots*, 45 F.3d at 1152 (citing *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439). In addition, the government must intend to create a public forum by "intentionally opening a nontraditional forum for public discourse." *Krishna Consciousness*, 505 U.S. at 680, 112 S.Ct. 2701 (citing *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439).

The advertisement spaces are in the main concourses of the airport, and contain advertisements by a variety of commercial companies, including some of the hotels that offer courtesy vehicle services to the airport. The principal purpose of the advertising display cases is to generate revenue for the Authority. (Tr. at 69.) There is no evidence that the current advertisement space is geared towards promoting any particular type of business or venture, or aimed at any particular type of traveler.

Furthermore, there is no evidence that the Authority has intended to make the space available for public expression, as is required to find that it is a designated public forum. *See Krishna Consciousness*, 505 U.S. at 680, 112 S.Ct. 2701; *New York Magazine*, 136 F.3d at 130 (finding that advertising spaces on outside of MTA buses was designated public forum because MTA accepts political and commercial advertisements); *Lebron v. Washington Metro. Area Transit Auth.*, 749 F.2d 893, 896 (D.C.Cir.1984). Neither party provided any evidence that the advertising space had ever been used for non-commercial purposes such as for public service announcements or political advertisements. Every indication is that the Authority uses the advertising space to generate revenue and promote business both within the airport and peripherally to passengers using the airport. The fact that they disallow advertisements from competing airlines and parking facilities supports the finding that the advertising spaces are not open for public expression and are not intended as such. *See Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) ("[a] designated public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers.").

The Court therefore finds that the advertisement space within the airport terminals is not a "designated public forum" because the Authority has not made it available for public expression, and instead limits its use to commercial ventures. The Court's finding is also supported by the Authority's role in this speech-related venture. When the government is engaged in commerce related to the challenged fora,

that inquiry is relevant to the classification of such fora. *United States v. Laton,* 352 F.3d 286, 293 (6th Cir.2003). Thus, if the government is acting as a commercial participant, rather than as a regulator, the public space is not likely a public forum. *See Lehman,* 418 U.S. at 303, 94 S.Ct. 2714 (holding that a municipal vehicle is not a public forum because "the city is engaged in commerce" and the advertising space is a commercial venture); *Krishna Consciousness,* 505 U.S. at 678, 112 S.Ct. 2701 (1992) (finding that government acts as a proprietor when it owns and operates an airport); *United States v. Kokinda,* 497 U.S. 720, 725, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). Governmental bodies that operate airports are generally regarded as a market participant, and the parties here have stipulated that the Authority is acting in a proprietary fashion in operating the airport. *See e.g., Four T's, Inc. v. Little Rock Mun. Airport Comm'n,* 108 F.3d 909, 912 (8th Cir.1997); *Air Line Pilots,* 45 F.3d 1144; *Capital Leasing,* 13 F.Supp.2d at 658. The revenue-generating purpose of the advertisement space further supports the fact that the government is acting in its proprietary capacity with regards to the challenged speech. Since the Authority is acting in its proprietary function, its regulations are subject to less First Amendment scrutiny.

▮ The Court concludes that the advertisement space is a non-public forum. "In a nonpublic forum the government may restrict expression 'based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" *Change the Climate,* 214 F.Supp.2d at 132 (quoting *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439). Under Authority procedures, the Board was to approve any prospective advertiser, and then any prospective advertisements to be placed within the airport. (Tr. at 69.) The regulation in question here prohibits the Plaintiff, and similar competing businesses from advertising in the airport terminal. The distinction is therefore made based upon the identity of the speakers. The Plaintiff's parking business competes with the Authority's parking lots and thus they are disallowed from placing any advertisement promoting their business. Defendant merely seeks to protect the sources of its income, which includes its parking lots. The Court has already found this to be a legitimate purpose. *See Park Shuttle N Fly,* No. 03cv461, at * 12. Thus, as long as the regulation is reasonable in light of that purpose, it meets constitutional standards.

The Defendant's restrictions on Plaintiff's advertisements are reasonable given its purpose to generate revenue. Each person that parks at Plaintiff's facilities for the purposes of accessing the airport could potentially park in the airport's lots and generate direct revenue for the Authority. The Authority generates substantially more revenue from customers parking in its lots than it does from the privilege fees that Park Shuttle pays for its customers. It promotes this interest by disallowing Plaintiff to advertise on its property. Further, since the regulation applies to purely commercial speech, the Authority has more freedom than it would for a similar non-commercial advertisement. *See Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 514, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) ("[a]lthough the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of non-commercial speech . . .") (citing *Carey v. Brown,* 447 U.S. 455, 462, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)). The Defendant operates the airport and must be financially self-sufficient, and the Court finds that it is reasonable to impose restrictions regulating com-

mercial advertising towards competitors such as Plaintiff on airport property.

The Plaintiff has failed to meet its burden of proving that Defendant's content based restrictions in this non-public forum violate the First Amendment. The Court declines to consider whether Defendant's "guidelines" are unconstitutionally vague because the parties have not raised the issue.[6] The Court does, however, limit its holding to the Plaintiff in this matter because the parties have stipulated that Plaintiff directly competes with the Authority. (Final Pre–Trial Order ¶ 20q).

## IV. CONCLUSION

The Court finds that Defendant's regulation is constitutionally valid as it satisfies the requirements of both the Equal Protection Clause and the Commerce Clause. In addition, Defendant's policy regarding advertising is constitutional and does not violate the First Amendment. For the reasons stated above, the Court awards judgment to the **DEFENDANT**.

**IT IS SO ORDERED.**

6. Other courts considering the matter of advertising restrictions have focused on the requirement that guidelines be "as concise as is consistent with clarity, and free of calculated ambiguity." *See Change the Climate*, 214 F.Supp.2d at 164; *AIDS Action Comm. v. Mass. Bay Transp. Auth.*, 42 F.3d 1, 10–12 (1st Cir.1994). *But see Amtrak*, 69 F.3d at 656 (reasoning that Amtrak's practice, though unwritten, was clear not to open the space for anything except purely commercial advertising). The Defendant's testimony regarding the regulations, however, was unchallenged and the parties' stipulation establishes that Plaintiff, at least, clearly falls within the enumerated criteria.